**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

RANDALL W. THAYER                    CASE NO. 2:20-CV-12693

     *Plaintiff,*                         HON. TERRENCE G. BERG
*v.*                                 DISTRICT JUDGE

COMISSIONER OF SOCIAL                HON. PATRICIA T. MORRIS
SECURITY,                            MAGISTRATE JUDGE

     *Defendant.*
_____/

<u>**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS
MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 14, 17)**</u>

## I.    <u>RECOMMENDATION</u>

Plaintiff Randall Thayer challenges the Commissioner of Social Security regarding a final decision denying his claims for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  The case was referred to the undersigned for review.  (ECF No. 3); *see* 28 U.S.C. § 636(b)(1)(B) (2012); E.D. Mich. LR 72.1(b)(3).  For the reasons below, I conclude that substantial evidence supports the Commissioner's decision.  Accordingly, I recommend **DENYING** Plaintiff's motion for summary judgment, (ECF No. 14), **GRANTING** the Commissioner's motion, (ECF No. 17), and affirming the decision.

## II.   <u>REPORT</u>

### A.  Introduction and Procedural History

Plaintiff's applications for DIB and SSI were protectively filed on February 1, 2019. (ECF No. 12, at PageID.56, 120, 135, 221, 229.)  He alleged that he became disabled on January 31, 2019.  (*Id.*)  The Commissioner denied the claim on June 25, 2019. (*Id.* at PageID.56, 141, 150.)  Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which occurred on January 21, 2020.  (*Id.* at PageID.56, 76.)  The ALJ issued a decision on January 21, 2020, finding that Plaintiff was not disabled.  (*Id.* at PageID.53, 71.)  The Appeals Council denied review on October 2, 2020.  (*Id.* at PageID.42.)  Plaintiff sought judicial review on December 3, 2020.  (ECF No. 1.)  The parties filed cross-motions for summary judgment and briefing is complete.  (ECF Nos. 14, 17.)

### B.  Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g) (2012).  The District Court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  "[T]he threshold for such evidentiary sufficiency is not high . . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154

(2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Id*. at 286 (internal citations omitted).

### C.  Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A) (2012). The Commissioner's regulations provide that disability is determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2021); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2021).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2021)).

4

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 12, at PageID.71.)  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since "January 31, 2019, the alleged onset date." (*Id*. at PageID.58.)  At step two, the ALJ concluded that Plaintiff had the following severe impairments: depression, anxiety, panic disorder, obsessive-compulsive disorder, and Parkinson's syndrome.  (*Id*.)  The ALJ found the following impairments to be non-severe: history of neurocardiogenic syncope/presyncope, nonischemic cardiomyopathy, mitral valve prolapse, prediabetes, gastroesophageal reflux disease, hypertension, asthma, degenerative disc disease, obesity, and unstable angina.  (*Id*. at PageID.59.)  The ALJ also noted that Plaintiff's bipolar disorder, his history of inguinal hernias, and his history of ulcer with hematemesis were not medically determinable impairments and therefore not severe.  (*Id*. at PageID.59–60.)  None of these impairments met or medically equaled a listed impairment at step three.  (*Id.* at PageID.60–61.)  Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC"):

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except: He is limited to frequent handling, fingering and feeling with the bilateral hands.  He can only frequently push and pull with his upper extremities.  He can never work around hazards, such as unprotected heights or moving dangerous mechanical parts. He can occasionally operate a motor vehicle.  He can occasionally work outdoors in the weather, in conditions of humidity and wetness, and in conditions of extreme heat or cold, and in conditions where vibrations are present.  He is also limited to performing simple, routine and repetitive tasks, but not at a production rate pace, for example, no assembly line work.  He is limited to no tandem or team tasks. He is limited to simple work-related decisions.  He can respond appropriately to occasional interaction with supervisors, coworkers, and the general public. He is limited to tolerating few changes in the work setting, defined as routine

job duties that remain static and are performed in a stable, predictable work setting. Any necessary changes need to occur infrequently, and be adequately and easily explained.

(*Id.* at PageID.62.) At step four, the ALJ found that Plaintiff could not perform his past relevant work as a maintenance worker, greeter, machine operator, production worker, or spot welder. (*Id.* at PageID.69.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy, including, work as a "housekeeping cleaner," a "merchandise maker," and a "mailroom clerk." (*Id.* at PageID.70.) Accordingly, the ALJ concluded that Plaintiff was not disabled. (*Id.* at PageID.71.)

### E. Administrative Record

#### i. Medical Evidence

On January 29, 2019, Plaintiff, Randall Thayer, was diagnosed with "features that are suggestive of a parkinsonian tremor." (ECF No. 12, at PageID.363.) Days later Plaintiff quit his job as a Walmart greeter and subsequently filed for SSI and DIB. (*Id.* at PageID.56, 85.) Before developing his tremors, Plaintiff had been diagnosed with several mental impairments, including anxiety, depression, panic disorder, and obsessive-compulsive disorder ("OCD").[1] (*Id.* at PageID.371, 376, 382.)

Plaintiff's health was evaluated by four state consultants: an examining physician, a non-examining physician, an examining psychologist, and a non-examining psychologist. (*Id.* at PageID.66–68.) The examining physician found that Plaintiff had a tremor in both

---

[1] Plaintiff was also diagnosed with a "suspected" bipolar disorder. (*Id.* at PageID.371.)

6

hands that "abated with intention." (*Id.* at PageID.66, 666.)  Plaintiff's "motor strength was intact" and he tested negative for balance problems.  (*Id.* at PageID.66.)  Plaintiff's "grip strength was intact[,] and his manual dexterity was unimpaired." (*Id.* at PageID.66, 663.)  Moreover, he walked with a normal gait and displayed only a slightly limited range of motion.   (*Id.* at PageID.66, 663–64.)  He opined that Plaintiff could stand for only four hours per day; carry, push, or pull less than twenty-five pounds; and write only briefly.  (*Id.* at PageID.66, 666.)  The non-examining physician opined that Plaintiff could perform "light work" subject to various limitations on the use of Plaintiff's hands.  (*Id.* at PageID.67, 115–16, 130–31.)

At his examination with the examining psychologist, Plaintiff reported obsessive-compulsive behavior, depression, and anxiety.  (*Id.* at PageID.67, 626.)  Plaintiff also appeared "anxious and depressed, with a low mood, subdued affect[,] and fair to poor attitude." (*Id.* at PageID.67, 627.)  Although Plaintiff reported having social anxiety and no friends, he also reported having a supportive family.  (*Id.* at PageID.67, 626.)  The examining psychologist opined that employment would likely exacerbate Plaintiff's symptoms.  (*Id.* at PageID.68, 628.)  However, the ALJ found that her opinion was not persuasive because it was "presented in speculative terms" and her opinion that Plaintiff was "prone to episodes of decompensation" was undercut by the fact that Plaintiff had not been hospitalized for psychiatric reasons in over three years.  (*Id.* at PageID.68.)

Unlike the examining psychologist, the non-examining psychologist found that Plaintiff was not disabled because he could "sustain simple instructions independently"

and "respond appropriately to supervision, coworkers[,] and work situations." (*Id.* at PageID.68, 117–18, 132–33.)

Plaintiff also presented the opinions of two of his treating physicians: Doctor Stanford Rapp, his neurologist, and Doctor Shumaila Younas, his psychiatrist. (*Id.* at PageID.66–67.) Doctor Rapp opined that Plaintiff should work no more than eight hours per day due to an unspecified "medical condition." (*Id.* at PageID.66, 333.) Doctor Rapp provided no further explanation. However, Plaintiff was working as a greeter until this opinion was rendered, and medical reports indicate that Plaintiff's Parkinson's symptoms improved after receiving medication. (*Id.* at PageID.66, 762, 764, 894–97, 903.)

On January 15, 2019, Doctor Younas opined that Plaintiff could not perform any job, citing "high scores on screenings for depression and anxiety." (*Id.* at PageID.67, 941.) Just a week later, however, Doctor Younas recommended that could work up to twenty-eight hours per week, but provided no rationale to support her opinion. (*Id.* at PageID.67, 342.) Despite Doctor Younas's opinions, Plaintiff continued to work throughout January and Doctor Younas's records generally showed overall improvement in Plaintiff's depression and anxiety. (*Id.* at PageID.56, 67, 364, 742, 744, 941.)

### ii.    Plaintiff's Testimony at the Administrative Hearing

The ALJ began the hearing by allowing Plaintiff's counsel to make an opening statement. (*Id.* at PageID.79.) Plaintiff's counsel informed the ALJ that Plaintiff suffered from Parkinson's, OCD, bipolar disorder, panic disorder, and social anxiety. Counsel also cited medical opinions that Plaintiff's mental impairments would completely preclude him

from working and that his physical impairments would limit him to "less than light" work. (*Id.* at PageID.79–80.)

After counsel's opening statement, the ALJ examined Plaintiff.  The ALJ began her examination by asking Plaintiff about his work history.  (*Id.* at PageID.86.)  Plaintiff testified that his most recent job was as a door greater for Walmart.  (*Id.*)  While the position required him to stand for his entire shift, he would often lean against a wall for support. (*Id.* at PageID.87.)  Prior to working at Walmart, Plaintiff worked as a maintenance worker, which required him to stand for his entire shift and lift up to ten pounds at a time.  (*Id.* at PageID.86–87.)  Plaintiff also worked as a parts clerk at O'Reilly's Auto Parts, a machine operator at GateHouse Media, a spot welder, and a temporary worker at a production plant. (*Id.* at PageID.79.)  Plaintiff also testified that he had an associate's degree in criminal justice, but that he never pursued a career in that field.  (*Id.* at PageID.83–84.)

The ALJ then questioned Plaintiff regarding his physical impairments.  (*Id.* at PageID.92–93.)  Plaintiff stated that he had difficulty standing, concentrating, balancing, and using his hands.  (*Id.* at PageID.93.)  Plaintiff stated that his hands shook, and that as a result he struggled to write and would sometimes spill drinks.  (*Id.* at PageID.84, 92, 94.) Still, Plaintiff could independently drive, read, make change, and do basic household chores with some assistance.  (*Id.* at PageID.84, 95.)  He testified that his neurologist had prescribed him medication to alleviate his tremors, but that the medication was only marginally effective.  (*Id.* at PageID.92–93.)  Further, Plaintiff testified that he often had to hold onto various objects for support due to his impaired balance.  (*Id.* at PageID.92.)

For example, when descending stairs or entering his shower, Plaintiff stated that he would have to hold on to something with his hand for support.  (*Id.* at PageID.81, 85.)

The ALJ then questioned Plaintiff about his mental impairments.  (*Id.* at PageID.93–94.)  Plaintiff testified that it was hard for him to socialize and that he would panic whenever he was exposed to a large group of people.  (*Id.* at PageID.94.)  While Plaintiff lived with his wife and adult son, he stated that he otherwise had little contact with his family.  (*Id.* at PageID.81, 96.)  For example, he had not spoken with his stepdaughter in approximately two years.  (*Id.* at PageID.82.)  He also mentioned that he sometimes struggled to concentrate.  (*Id.* at PageID.87.)  Plaintiff would occasionally see a psychiatrist who prescribed him medication, and he also saw a counselor once every two to three weeks.  (*Id.* at PageID.93.)  Plaintiff testified that while his medication helped, it was not completely effective, as his mood would still fluctuate from day to day.  (*Id.* at PageID.99.)

### iii.    The Vocational Expert's Testimony at the Administrative Hearing

After allowing Plaintiff's counsel to examine Plaintiff, the ALJ questioned the vocational expert ("VE").[2]  (*Id.* at PageID.98–100.)  The ALJ first asked the VE whether an individual with the same age, education, and experience as Plaintiff could perform "light work" as defined by the DOT, except that

> He is limited to frequent handling, fingering[,] and feeling with the bilateral hands.  He can only frequently push and pull with his ppr extremities.  He can never work around hazards such as unprotected heights or moving dangerous mechanical parts.  He can occasionally operate a motor vehicle.

---

[2] Before questioning the VE, the ALJ informed the VE that she would assume that all of the VE's answers were consistent with the Dictionary of Occupational Titles ("DOT"), unless the VE told her otherwise.  (*Id.* at PageID.100.)  The VE never indicated that his testimony was inconsistent with the DOT.  (*Id.* at PageID.101–04.)

> He can occasionally work outdoors in the weather in conditions of humidity and wetness[,] and in conditions of extreme heat or cold[,] and in conditions where vibrations are present.

(*Id.* at PageID.101–102.)  The ALJ's hypothetical also provided several limitations to account for the hypothetical person's mental impairments:

> He is also limited to performing simple, routine[,] and repetitive tasks, but not at a production rate pace.  For example, no assembly line work.  He is limited to no tandem or team tasks.  He is limited to simple, work-related decisions.  He can respond appropriately to occasional interaction with supervisors, coworkers[,] and the general public.  He is limited to tolerating few changes in the work setting[, meaning that he requires] routine job duties that remain static and are performed in a stable, predictable environment.  Any necessary changes need to occur infrequently and be adequately and easily explained.

(*Id.* at PageID.102.)  The VE testified that a person with these limitations could not perform any of Plaintiff's past work.  (*Id.*)  However, the VE testified that the hypothetical person could perform any "unskilled SVP 2 level, light exertion level jobs," including: housekeeping cleaner, DOT code 323.687-014, approximately 250,000 jobs; merchandise marker, DOT code 209.587-034, approximately 230,000 jobs; and mailing clerk, DOT code 209.687-026, approximately 120,000 jobs.  (*Id.* at PageID.102–103.)

The ALJ then asked the VE whether any jobs would be available under two different hypotheticals.  First, she asked whether any jobs would be available for someone with the same restrictions but who could only perform sedentary work.  (*Id.* at PageID.103.)  The VE testified that this person could not perform Plaintiff's past work, but the VE was not asked to testify as to whether any jobs in the national economy existed for someone with these limitations.  (*Id.*)  Second, the ALJ asked whether someone with the same limitations as the second hypothetical, but who was limited to "occasional use of their bilateral hands"

11

could work at the light or sedentary levels.  (*Id.*)  The VE responded that such a restriction would preclude the hypothetical person from working.  (*Id.*)  Last, the VE testified that in competitive employment, an employee would be allowed no more than two days off of work per month.  (*Id.* at PageID.104.)

## F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B) (2012).  The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)    Licensed physician (medical or osteopathic doctor);

(2)    Licensed Psychologist, which includes:

    (i)    A licensed or certified psychologist at the independent practice level; or

    (ii)   A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)    Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)    Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)     Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)     Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)     Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)     Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a) (2021).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.* § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.* § 404.1502(e).  "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.* § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.* § 404.1520c(c)(3). This factor will include the analysis of:

(i)     Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

14

(ii)    Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)   Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)    Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)     Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.* § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his

or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.* § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a

medical source's medical opinions or prior administrative medical findings in your determination or decision.  We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c).  The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)     Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)   Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)     Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.* § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.* § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your

18

statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.* § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when

considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.* § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.* § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or

nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . .  We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]"  *Id.*  The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

> (i)    [D]aily activities;
>
> (ii)   The location, duration, frequency, and intensity of . . . pain;
>
> (iii)  Precipitating and aggravating factors;
>
> (iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
>
> (v)    Treatment, other than medication, . . . received for relief of . . . pain;
>
> (vi)   Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work."  *Id.* § 404.1530(a).  Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits."  *Id.* § 404.1530(b).  Acceptable (or "good") reasons for failure to follow prescribed treatment include:

> (1)    The specific medical treatment is contrary to the established teaching and tenets of your religion;

21

(2)     The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)     The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)     The treatment involves amputation of an extremity, or major part of an extremity.

*Id.* § 404.1530(c).

## G. Arguments and Analysis

### i. Listing 12.04

Plaintiff first argues that the ALJ did not rely on substantial evidence in finding that Plaintiff's depression did not meet, or medically equal, listing 12.04. At step three, a Plaintiff can show that they are conclusively disabled by proving that they meet every element of a given listing. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). If a claimant cannot meet every element of a listing, the claimant may still show that they are disabled at step three by showing that they have an impairment, or combination of impairments, that medically equal a listing. 20 C.F.R. § 416.924(a) (2021). A claimant can show medical equivalence under one of three circumstances: (1) the claimant has a listed impairment but either cannot show findings that meet one or more criteria or cannot show that his findings are as severe as the listing's criteria; (2) the clamant has a medical impairment that is not covered by any listing; or (3) the claimant has a combination of impairments that do not meet any listing. *Id.* § 416.924(b). Under each prong, the claimant must present findings

that are "of equal medical significance" to the requirements of the closest listed impairment. *Id.* The claimant carries the burden of proving that his or her impairments meet or medically equal a listing. *Sullivan*, 493 U.S. at 530.

Under listing 12.04—the listing for depression, bipolar, and related disorders—a claimant must first provide medical documentation indicating that he or she suffers symptoms of either depression or bipolar disorder. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.04(A). If a claimant satisfies this requirement, then the claimant will meet listing 12.04 if he or she can (1) show sufficient limitations in his or her mental functioning under paragraph B of the listing, or (2) show that his or her disorder is "serious and persistent" under paragraph C. *Id.* § 12.04(B)–(C). While the ALJ did not explicitly consider whether Plaintiff provided medical documentation indicating that he suffers from depression or bipolar disorder, both parties agree, correctly, that this element of the listing has been met. (ECF No. 17, at PageID.978–79; ECF No. 14, at PageID.962; ECF No. 12, at PageID.58, 60, 371, 376, 382, 754–55.) Thus, Plaintiff must show that the ALJ did not rely on substantial evidence in finding that he did not meet or medically equal paragraphs B or C.

## 1. Paragraph B

Paragraph B provides that a claimant may meet the listing by showing an "[e]xtreme limitation of one, or marked limitation of two, . . . areas of mental functioning." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.04(B). These areas are: (1) the claimant's ability to "[u]nderstand, remember, or apply information;" (2) the claimant's ability to "[i]nteract

with others;" (3) the claimaint's ability to "[c]oncentrate, persist, or maintain pace;" and (4) the claimant's ability to [a]dapt or manage" his or herself. *Id.*

In each area, an ALJ can assess one of five levels of mental functioning. From least to most restrictive, these levels are: no limitation, mild limitation, moderate limitation, marked limitation, and extreme limitation. *Id.* § 12.00(F)(2). An extreme limitation is defined as a complete inability to function in a given area, whereas a marked limitation is defined as a serious limitation in one's ability to function in a given area. Additionally, a moderate limitation describes a "fair" ability to function, and a mild limitation describes a "slight" limitation. *Id.*

In the present case, the ALJ relied on substantial evidence in finding only a moderate impairment in each area of mental functioning. First, the ALJ's finding that Plaintiff had only a moderate limitation in "understanding, remembering[,] or applying information" is supported by substantial evidence. This area addresses a claimant's "ability[y] to learn, recall, and use information to perform work activities." *Id.* § 12.00(E)(1). While the ALJ considered Plaintiff's self-reported memory problems, the ALJ also noted that there was "no evidence of significant intellectual defect." Indeed, multiple examinations in the record reported that Plaintiff's "memory and cognitive functioning were intact." (ECF No. 12, at PageID.60–61, 364, 594, 627, 648, 663, 744, 753, 894, 902, 911, 918); *cf. Deaner v. Comm'r of Soc. Sec.*, 840 F. App'x 813, 818 (6th Cir. 2020).

With respect to Plaintiff's ability to interact with others, which "refers to the abilities to relate to and work with supervisors, co-workers, and the public" the ALJ's finding that

Plaintiff was only moderately impaired is supported by substantial evidence.  20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(E)(2).  While Plaintiff reported that he becomes anxious when interacting with others, he also kept in touch with a "supportive" family, lived with his wife and son, maintained a healthy relationship with his in-laws, and generally displayed appropriate behavior.  (ECF No. 12, at PageID.270, 364, 593–94, 626–27, 649, 662–63, 742–43, 751–52, 764, 872, 895, 903, 910–11, 918.)  Further, the record contained no evidence that Plaintiff behaved inappropriately in public or engaged in "significant" altercations with others.  (*Id.* at PageID.61); *cf. Wicker v. Comm'r of Soc. Sec.*, No. 18-11276, 2020 WL 522003, at *8 (E.D. Mich. Jan. 10, 2020) ("[T]he ALJ . . . [properly] rated Plaintiff's limitations as moderate because she lives with her mother and children and maintains regular contact with other family members.").

Next, the ALJ relied on substantial evidence in finding that Plaintiff has a moderate limitation in "concentrating, persisting[,] or maintaining pace."  This area assesses a claimant's "abilities to focus attention on work activities and stay on task at a sustained rate." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(E)(3).  Here, while Plaintiff "reported significant difficulties," the ALJ recognized that "his attention was intact upon mental status examinations throughout the record."  (ECF No. 12, at PageID.61, 364, 594, 648–49, 663, 743–44, 752–53, 894–95, 902, 910–11, 918); *cf. Deaner*, 840 F. App'x at 819.

Last, the ALJ relied on substantial evidence in finding that Plaintiff was only moderately limited in "adapting or managing" himself.  This area assesses a claimant's ability "to regulate emotions, control behavior, and maintain well-being in a work setting."

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(E)(4).  Here, the ALJ recognized that Plaintiff "attributed most of his difficulties performing activities of daily living primarily to his physical, rather than mental, impairments . . . ."  (ECF No. 12, at PageID.61.)  Moreover, Plaintiff could leave his house daily, prepare simple meals, shop with some assistance, drive, pay bills, manage bank accounts, and go most places independently.  (*Id.* at PAgeID.61, 68–69, 84, 95, 268–70.)  Accordingly, the ALJ relied on substantial evidence in finding that Plaintiff did not meet or medically equal paragraph B of the listing.  Cf. *Wicker*, 2020 WL 522003, at *8 ("Plaintiff had moderate limitations in "adapting or managing oneself" because she could independently attend medical appointments, and she is independent in preparing food, her personal hygiene, shopping, bill paying, and driving a car.")

## 2.  Paragraph C

Alternatively, Plaintiff could have satisfied step three by showing that his impairments met or medically equaled paragraph C of listing 12.04.  20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.04(C).  Under paragraph C, a claimant can meet or equal listing 12.04 by showing that his or her impairments are "serious and persistent."  *Id.*  To show that an impairment is serious and persistent, a claimant must show (1) a medically documented history of the existence of the claimant's impairment for the preceding two years, (2) ongoing medical treatment that diminishes symptoms and signs of the disorder, and (3) "that, despite the claimant's "diminished symptoms and signs," the claimant has "achieved only marginal adjustment."  *Id.* § 12.00(G)(2).  Because Plaintiff has a

documented history of treatment over the preceding two years that has diminished his symptoms, the only element seriously at issue is whether Plaintiff has displayed "marginal adjustment."

Marginal adjustment means that a claimant's "adaptation to the requirements of daily life is fragile." In other words, a claimant has "minimal capacity to adapt to changes in [his or her] environment or to demands that are not already part of [his or her] daily life." *Id.* § 12.00(G)(2)(c). A claimant is considered to have achieved only marginal adjustment "when the evidence shows that changes or increased demands have led to exacerbation of [his or her] symptoms and signs and to deterioration in [his or her] functioning." *Id.* For example, this could mean that a claimant has "become unable to function outside" of his or her "home . . . without substantial psychosocial support." *Id.* A claimant's deteriorated functioning might be evidenced by facts such as "a significant change in medication" or frequent hospitalizations. *Id.*

While the ALJ provided a cursory discussion of paragraph C—stating simply that Plaintiff failed to meet the paragraph C criteria and that the record contained no evidence that Plaintiff required "a highly structured setting" or that Plaintiff required "substantial psychosocial support," the ALJ's finding is nonetheless supported by substantial evidence. (ECF No. 12, at PageID.61.) First, the ALJ correctly noted that the record simply lacked evidence, such as a "significant change in medication" or frequent hospitalizations, that tended to show marginal adjustment, which Plaintiff could have used to meet his burden of proof. (*Id.* at PageID.61, 64–65.) Instead, the record is replete with evidence that

Plaintiff responded well to a modest and consistent treatment regimen comprised of medication and therapy and that he could function outside of the home without substantial psychosocial support. (*Id.* at PageID.64–65, 68–69, 363, 666, 671, 742, 743–44, 751–52, 762, 883.)   As discussed, Plaintiff could leave his house daily and go most places independently. (*Id.* at PageID.61.)   Moreover, the ALJ's finding is supported by the non-examining psychological consultant's opinion that Plaintiff did not meet or equal the paragraph C criteria. (*Id.* at PageID.113.)

Plaintiff argues that the ALJ erred because Plaintiff's moderate limitations in each of the paragraph B criteria provides substantial evidence that displayed "marginal adjustment" under paragraph C.   First, Plaintiff's moderate limitations are not substantial evidence that he achieved only marginal adjustment.   The regulations define a moderate limitation as a "fair" ability to function that is *less than* a "serious" limitation, but more than a "slight" limitation.   20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(F)(2)(b)–(d).   In stark contrast are the elements of paragraph C which require claimants to show a "*serious*" disorder, evidenced by considerable signs of deterioration such as psychiatric hospitalization or "significant change[s] in treatment.   20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.04(C) (emphasis added).   Moreover, even if Plaintiff's moderate limitations could constitute substantial evidence that Plaintiff had a "serious and persistent" impairment, this Court cannot remand an ALJ's decision simply because substantial evidence might also support a different conclusion. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284,

286 (6th Cir. 1994).  Because the ALJ relied on substantial evidence, she did not err in her analysis of paragraph C of the listing.

Additionally, Plaintiff argues that the ALJ's cursory discussion of paragraph C was inadequate and that this Court cannot consider facts not mentioned by the ALJ to find substantial evidence that supports the ALJ's finding because doing so would amount to an impermissible *post hoc* rationalization.

First, "there is no 'heightened articulation standard,' and ALJs need not 'spell[ ] out every consideration that went into' their conclusions." *McDonald v. Comm'r of Soc. Sec.*, No. 2:16-cv-14015, 2017 WL 4052190, at *8 (E.D. Mich. July 27, 2017) (citing *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)).  With respect to whether a claimant has met a listing, an ALJ need only provide enough information to "facilitate effective and meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).   Here, while the ALJ provided a limited discussion of paragraph C, her discussion in other parts of her decision provides sufficient rationale for this Court to determine why she failed to find that Plaintiff exhibited only "marginal adjustment" under paragraph C.  *Cf. Bledsoe*, 165 F. App'x at *3; *Gang v. Comm'r of Soc. Sec.*, No. 2:20-cv-3267, 2021 WL 2800709, at *11 (S.D. Ohio July 6, 2021).

The ALJ here noted a general absence of evidence that might show that Plaintiff met or equaled paragraph C.  (ECF No. 12, at PageID.61.)  Specifically, the ALJ noted that the record lacked evidence showing that Plaintiff "require[d] a highly structured setting," that he had "a minimal capacity to adjust to changes," or that he required "substantial

psychosocial support to function outside" of the home.  (*Id.*)  While an ALJ generally has a duty to articulate his or her findings, it is the Plaintiff, not the ALJ, who carries the burden to show evidence that meets or equals the listing.  *Sullivan*, 493 U.S. at 530; *Reynolds*, 424 F. App'x at 414.  Naturally, where a claimant fails to present any evidence that could meet a listing, the ALJ's discussion will be somewhat cursory—the ALJ cannot point to evidence that does not exist.

Even so, other portions of the ALJ's decision provide sufficient analysis for this Court to review the ALJ's rationale for finding that Plaintiff was not marginally adjusted. The ALJ noted that Plaintiff responded well to mental health treatment as he had no psychiatric hospitalizations during the relevant period and reported feeling "more relaxed, calm, and composed."  (ECF No. 12, at PageID.64–65, 68); *see* 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00(G)(2)(c) (providing that marginal adjustment may be evidenced by psychiatric hospitalization).   Further, the ALJ's decision cited the non-examining consulting psychiatrists, who opined that Plaintiff did not satisfy the requirements of paragraph C.  (ECF No. 12, at PageID.66, 113.)  The ALJ also mentioned that Plaintiff kept in touch with his family, and that he could perform common tasks such as cooking, shopping, paying bills, driving, and managing bank accounts.  (*Id.* at PageID.61.)  This evidence, along with the ALJ's statement that she could not find sufficient evidence in the record that satisfied Plaintiff's burden of proof, constitutes sufficient articulation.  (*Id.*); *see Forrest v. Comm'r of Soc. Sec.*, 591 Fed. App'x 359, 366 (6th Cir. 2014) (upholding an ALJ's cursory step three finding where the ALJ made "sufficient factual findings elsewhere

in his decision to support his conclusion at [s]tep [t]hree").   Moreover, with respect to medical equivalence, the ALJ was "not required to articulate specific evidence supporting [her] finding."  SSR 17-2p. 2017 WL 3928306, at *4 (Mar. 27, 2017).

Further, Plaintiff is correct that this Court may not accept a "*post hoc* rationalization for [an] agency action in lieu of [accurate] reasons and findings enunciated by the [ALJ]." *Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 524 (6th Cir. 2014) (quoting *Hyatt Corp. v. N.L.R.B.*, 939 F.2d 361, 367 (6th Cir. 1991)).   However, it is well established that "the district court may look to any evidence in the record regardless of whether it has been cited by the [ALJ]."  *Walker v. Sec'y of Health and Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989); *Hizer v. Comm'r of Soc. Sec.*, 852 F. App'x 999, 1000 (6th Cir. 2021).   In fact, "judicial review of the [ALJ]'s findings *must* be based upon the record taken as a whole." *Walker*, 884 F.2d at 245 (emphasis added).   Thus, this Court need not limit its review to evidence specifically mentioned by the ALJ—it may look at the entire record.  *Id.*

Accordingly, considering evidence not specifically mentioned by the ALJ does not constitute a *post hoc* rationalization.   The rule against *post hoc* rationalizations prohibits agencies from asserting entirely new arguments on appeal; it does not prohibit courts from identifying additional evidence that supports the original rationale behind an agency's decision.  *Compare Berryhill v. Shalala*, No. 92–5876, 1993 WL 361792 at *7 (6th Cir. Sept. 16, 1993) (holding that the District Court erred by considering whether the claimant had unearned income under a statute other than the one considered by the Appeals Council), *and Morrison v. Comm'r of Soc. Sec.*, No. 14-10984, 2015 WL 1197689, at *10–

11 (E.D. Mich. Mar. 16, 2015) (holding that where an ALJ failed to specify any specific listings before denying a claimant at step three, the Commissioner raised an invalid *post hoc* rationalization of the ALJ's decision by naming a new listing on appeal), *with Walker*, 884 F.2d at 245.

The latter is precisely what happened here—the ALJ stated broadly that after considering all evidence in the record, she failed to find substantial evidence showing that Plaintiff's impairments met or equaled paragraph C.  (ECF No. 12, at PageID.61.)  On appeal, the Commissioner does not present any new rationale for why Plaintiff failed to meet or equal a listing; rather, the Commissioner simply points to evidence in the record that supports the ALJ's rationale that Plaintiff did not meet or equal paragraph C.  (ECF No. 17, at PageID.984–86); *see Walker*, 884 F.2d at 245.  Thus, neither the Commissioner nor this Court has supplied a *post hoc* rationalization.  Accordingly, I suggest that the ALJ's finding that Plaintiff did not meet or medically equal listing 12.04 is supported by substantial evidence and free of legal error.[3]

### ii.  Whether the ALJ Was Required to Recontact Plaintiff's Treating Physician.

Plaintiff argues that the ALJ erred by failing to recontact his treating physician to determine the basis of her opinion that Plaintiff should work no more than 28 hours per week.  He argues that because her conclusory statement was unsupported by any medical

---

[3] Similarly, Plaintiff asserts that the Commissioner's argument that the ALJ relied on substantial evidence in finding Plaintiff's residual functioning capacity was an invalid *post hoc* rationalization because the Commissioner relied on evidence not directly cited by the ALJ.  (ECF No. 18, at PageID.1009.)  For the same reasons, I suggest that Plaintiff's argument lacks merit.

evidence, and the basis for her opinion could not be ascertained from the record, the ALJ was obligated to recontact her to determine the basis of her opinion.  However, Plaintiff's argument relies on regulations that have been rescinded.  Until 2017, SSR 96-5p required ALJ's to recontact medical sources if (1) their opinions were unsupported by evidence and (2) the ALJ could not "ascertain the basis of the opinion from the record."  SSR 96-5p, 1996 WL 374183, at *6 (July 2, 1996).  However, in 2017, SSR 96-5p was completely rescinded.[4]  SSR 96-2p, 2017 WL 3928298, at *1 (Mar. 27, 2017).  Thus, the ALJ had no duty to recontact Plaintiff's treating physician and did not err by failing to do so.

### iii.   Residual Functioning Capacity

#### 1.   Whether the ALJ Impermissibly Ignored Substantial Portions of the Record.

Next, Plaintiff argues that the ALJ did not rely on substantial evidence in finding Plaintiff's residual functioning capacity ("RFC").  Specifically, he argues that the ALJ selectively relied "only on those portions of the medical report that" supported her RFC finding.  As a result, Plaintiff argues that the ALJ's RFC finding is under-restrictive because it does not adequately account for Plaintiff's Parkinson's disease and mental impairments.

---

[4] The only situation where the current regulations state that an ALJ may recontact a medical source is addressed in 20 C.F.R. § 404.1520b(a), (b)(2)(i) (2021).  This regulation provides that when an ALJ lacks sufficient evidence to determine disability, the ALJ "*may*" recontact a claimant's medical source.  *Id.* (emphasis added).  While the Commissioner correctly states that the ALJ's decision to recontact medical sources under this regulation is completely discretionary, I recognize that this regulation is not germane to the narrow issue raised by Plaintiff.  An ALJ's decision to recontact a medical source under this regulation is triggered when he or she lacks sufficient evidence to determine disability, not where, as formerly addressed by SSR 96-5p, a medical source's opinion is unsupported by evidence.  *See id.*

Arguments, like Plaintiff's, that an ALJ "cherry picked" evidence are seldom successful because "the same process can be described more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009). Crediting an argument that the ALJ "cherry picked" evidence would necessarily require the District Court to reweigh the evidence. *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014). Thus, this Court will not reverse an ALJ's decision just because substantial evidence may have supported another finding; instead, this Court's review is limited to whether the ALJ's decision was supported by substantial evidence. *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 440 (6th Cir. 2017).

Plaintiff attempts to analogize this case to *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235 (6th Cir. 2002). In *Howard*, the Sixth Circuit held that an ALJ erred by dismissing treatment notes that contained "a substantial portion" of the claimant's medical history. *Id.* at 241–42. Although the notes contained several of the claimant's complaints along with the doctor's impressions, the ALJ dismissed them entirely because they were illegible, "handwritten gobblegook." *Id.* at 241. The Sixth Circuit disagreed that the notes were completely illegible and reasoned that because the ALJ completely disregarded a "significant portion" of the record, his decision was not supported by substantial evidence. *Id.* at 242.

However, unlike in *Howard*, the ALJ here did not completely disregard a "significant portion" of the record. The ALJ acknowledged that Plaintiff complained of Parkinson's, anxiety, and other impairments, but found that Plaintiff's complaints,

although somewhat probative, were inconsistent with other evidence in the record.  (ECF No. 12, at PageID.62–64.)

Indeed, unlike *Howard*, the ALJ's RFC finding in the present case was supported by substantial evidence.  First, the ALJ recognized plaintiff's self-reported symptoms.  (*Id.* at PageID.62–63.)  Specifically, Plaintiff reported having angina, "a back condition," syncope, and Parkinson's.  (*Id.* at PageID.62.)  Plaintiff testified that he has "difficulty standing and balancing," which makes it difficult for him to use stairs or walk for more than five minutes.  (*Id.* at PageID.63.)  He also reported that his Parkinson's causes his hands to shake intermittently, making it difficult for him to write or hold glasses of liquid.  (*Id.*)  Accordingly, the ALJ took Plaintiff's limited mobility into account by finding that Plaintiff could only perform light work with additional limitations on the use of his arms.  (*Id.* at PageID.62.)

However, the ALJ found that the objective evidence supporting Plaintiff's Parkinson's diagnosis was "rather weak."  (*Id.* at PageID.64.)  Indeed, on January 29, 2019, Plaintiff began to take medication for his tremors and reported "a slight improvement."  (*Id.* at PageID.63, 363, 597.)  In May, Plaintiff consulted a neurologist regarding his tremors.  (*Id.* at PageID.644–45.)  Plaintiff reported that "his tremors fluctuated throughout the day," and that "they subsided slightly" when "holding items tightly."  (*Id.* at PageID.63, 644–45.)  Plaintiff denied having "gait problems, weakness, "numbness," or "shortness of breath."  (*Id.* at PageID.645.)  He also reported difficulty swallowing, but "a subsequent swallow motility study was normal."  (*Id.* at PageID.645, 767.)  After examining Plaintiff's mobility, his neurologist concluded that his symptoms were "not entirely typical for

Parkinson's," partially because his tremors were "distractible" and could be "completely extinguished" depending on Plaintiff's movement.  (*Id.* at PageID.64, 649.)  Still, imaging of Plaintiff's brain the following month displayed activity that was consistent with Parkinson's.  (*Id.* at PageID.657.)

At another examination in September, Plaintiff continued to display physical signs that were inconsistent with Parkinson's.  (*Id.* at PageID.64, 894–95.)  He did, however, display a "pill rolling tremor," which is commonly associated with Parkinson's, but the examiner believed the tremor was "embellish[ed]."  (*Id.* at PageID.895); *Pill-Rolling Tremor*, *Stedman's Medical Dictionary* (28th ed. 2014).  Plaintiff was then prescribed a new medication for his tremors which alleviated his symptoms.  (*Id.* at PageID.895–97.) While he sometimes experienced "breakthrough" tremors, he explained that he would sometimes forget to take some doses of his medication.  (*Id.* at PageID.897.)  Follow up examinations in October and December reported that Plaintiff had undergone considerable improvement.  (*Id.* at PageID.903, 762, 764.) Overall, the objective evidence supporting Plaintiff's Parkinson's diagnosis was largely inconsistent; however, the ALJ noted that Plaintiff's observable symptoms, particularly his tremors, improved significantly on medication.  (*Id.* at PageID.64.)

Plaintiff also argues that the ALJ's RFC finding is not supported by substantial evidence because it inadequately accounted for Plaintiff's mental impairments.  As to Plaintiff's mental impairments, the ALJ found that although Plaintiff reported a mood disorder, obsessive compulsive disorder ("OCD"), difficulty concentrating, a panic

disorder, and social anxiety, the ALJ found that Plaintiff's mental impairments were reasonably controlled by medication and counseling. (*Id.* at PageID.62–63.)

In January 2019, Plaintiff was diagnosed with OCD and a "suspected bipolar disorder"; however, at the same time he reported that medication effectively stabilized his mood, reduced the frequency of his panic attacks, and improved the quality of his sleep. (*Id.* at PageID.16.) He was prescribed medication, and by May he reported further improvement as to his "mood stability, anxiety, and insomnia." (*Id.* at PageID.65, 421.) His scores following psychological screening were improved and "[h]e was observed to be more relaxed, calm, and composed . . . ." (*Id.*) At a separate neurology examination that month, he also "denied having confusion, decreased concentration, sleep problems, nervousness[,] or anxiety." (*Id.* at PageID.65, 645 (internal citation omitted).) He displayed "normal mood, behavior, thought content, judgment," and was "alert and fully oriented." (*Id.* at PageID.65, 648–49.) Notwithstanding an examination in October, where Plaintiff displayed a depressed and anxious mood, his physicians generally reported that his mood was stable throughout the rest of 2019. (*Id.* at PageID.65.) Plaintiff was never hospitalized for psychological symptoms and he maintained stable relationships with his family. (*Id.*)

The ALJ concluded that Plaintiff's mental impairments were "relatively mild." (*Id.*) While his symptoms fluctuated, they were generally under control while Plaintiff was on medication. (*See id.*) Still, the ALJ restricted Plaintiff's RFC to limit both his social interactions and the complexity of his workplace tasks. (*Id.* at 62, 65.) Given Plaintiff's

relatively mild, and generally controlled, symptoms, as well as the ALJ's restrictive RFC, I suggest that the ALJ's RFC finding was supported by substantial evidence.

### 2. Whether the ALJ Erred by Failing to Consider Plaintiff's Non-Severe Impairments in Her RFC Finding.

Plaintiff next argues that even if the ALJ adequately considered his Parkinson's and mental impairments, the RFC is still not supported by substantial evidence because the ALJ did not consider his non-severe impairments.  Plaintiff is correct that where an ALJ finds "that a claimant suffers from at least one severe impairment" at step two, the ALJ must "consider the limiting effects of" the claimant's "non-severe impairments" in conjunction with the claimant's severe impairment(s) "when determining the claimant's RFC."  *Garcia v. Comm'r of Soc. Sec.*, 105 F. Supp. 3d 805, 810–11 (S.D. Ohio 2015) (citing *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787 (6th Cir. 2009)).  It is not sufficient for an ALJ to assume that an impairment causes no limitations simply because it is non-severe.  *Id.*  Where an ALJ determines that an impairment "does not result in any work-related restrictions or limitations, the ALJ 'is required to state the basis for such conclusion."  *Katona v. Comm'r of Soc. Sec.*, No. 14–cv–10417, 2015 WL 871617, at *6 (E.D. Mich. Feb. 27, 2015).

However, "[t]he ALJ need not repeat substantially similar factual analyses at both steps [two] and [four]."  *Millsap v. Comm'r of Soc. Sec.*, No. 5:16-cv-13579, 2018 WL 912881, at *3 (E.D. Mich. Jan. 29, 2018) (internal quotation marks omitted).  In *Millsap*, the ALJ found at step two, after a detailed discussion, that the claimant's headaches were not a severe impairment.  *Id.* at *3.  While this Court believed the ALJ's step two discussion

was sufficient to show that the ALJ considered the Claimant's headaches at step four, this Court nonetheless buttressed its holding by noting that the ALJ expressly stated broadly that he considered all of the claimant's medically determinable impairments at step four. *Id.* at *3–4.  Moreover, the ALJ briefly mentioned at step four that the Claimant "did not report a significant problem with headaches."  *Id.* at *4.  Thus, while the ALJ's discussion of the claimant's headaches at step four was minimal, this Court nonetheless found that the ALJ had considered the Claimant's headaches at step four.  *Id.*

Here, the ALJ properly considered all of Plaintiff's impairments at step four.  First, with respect to Plaintiff's syncope, hernias, and cardiac conditions, the ALJ was not obligated to consider these conditions at step four because she found that they were not medically determinable impairments.  SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996); *Sanchez v. Berryhill*, No. cv 18-586, 2019 WL 2183403, at *4 (D. N.M. May 21, 2019) ("[I]f an ALJ concludes that a claimant's impairment is not "medically determinable," then the ALJ *may not* consider evidence of that impairment when assessing a claimant's RFC."); *see* 20 C.F.R. § 404.1545(a)(2).  With respect to Plaintiff's medically determinable, non-severe impairments, the ALJ explicitly stated at step two that she considered them "when assessing [Plaintiff's] residual functioning capacity."  (ECF No. 12, at PageID.59.) Further, the ALJ reasoned that there was no evidence that Plaintiff's prediabetes, gastroesophageal reflux disease, hypertension, and asthma (all non-severe medically determinable impairments) could not be controlled with medication and would not cause more than "minimal work-related limitations."  (*Id.*)  Similarly, the ALJ found that

Plaintiff's sleep apnea, lumbar disease, obesity, and hernias were mild and had minimal effects on Plaintiff's ability to work.  (*Id.*)

At step four, the ALJ again explicitly stated that she considered all of Plaintiff's medically determinable impairments, expressly naming several of them, and found that Plaintiff's medically determinable impairments could have, in combination, caused his alleged symptoms.  (*Id.* at PageID.62.)   While the next portion of the ALJ's RFC discussion, assessing the intensity of Plaintiff's symptoms, focuses primarily on Plaintiff's Parkinson's and mental health impairments, these were the most significant impairments that Plaintiff alleged.  (*Id.* at PageID.63–65.)   In contrast, the ALJ determined that Plaintiff's non-severe impairments had minimal impacts on his ability to work.  (*Id.* at PageID.59); *see Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988) ("[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education and experience."). Indeed, it appears that all of Plaintiff's alleged physical symptoms were largely attributable to his Parkinson's, and, in any event, the ALJ's RFC finding included several limitations to address Plaintiff's alleged symptoms, regardless of their underlying disease.  (*See* ECF No. 12, at PageID.59.) Accordingly, ALJ need not have spent much of her analysis on Plaintiff's non-severe impairments—the regulations only required her to *consider* Plaintiff's non-severe medically determinable impairments, and it is evident from her decision that she did exactly that. *Cf. Millsap*, 2018 WL 912881, at *4.

> **3.   Whether the ALJ Erred by Failing to Consider How Plaintiff's Impairments Would Affect His Work Attendance.**

Plaintiff also argues that the ALJ's RFC finding is deficient because the ALJ failed to address whether Plaintiff's impairments would cause him to frequently miss work. Plaintiff attempts to analogize this case to *Hartman v. Colvin*, 954 F. Supp. 2d 618 (W.D. Ky. 2013).  In *Hartman*, the Western District of Kentucky held that an ALJ erred by failing to discuss whether the claimant's history of frequent emergency room visits would impact his ability to maintain substantial gainful activity, despite the VE's testimony that the claimant would be precluded from substantial gainful activity if he were absent more than twice a month.  *Id.* at 645.  The Court reasoned that because the claimant had a history of frequent hospitalizations, the ALJ should have addressed whether these hospitalizations would be expected to occur more than twice per month in the future, such that the claimant would be precluded from working.  *Id.*

Plaintiff alleges, without citation, that his "tremors and gait," in combination with his "fatigue and weakness" would cause him to "miss work more than two days per month." (ECF No. 14, at PageID.965.)  However, while the VE here, like in *Hartman*, testified that any absences surpassing two per month would be work preclusive, there is simply no information in the record indicating that Plaintiff would frequently miss work for medical reasons.  Unlike in *Hartman*, there is no evidence here that Plaintiff has a history of frequent emergency room visits, and Plaintiff fails to present any evidence, outside of generalized symptoms, that would call into doubt his ability to attend work regularly.  (*See*

*id.*); *cf. Hartman*, 954 F. Supp. 2d at 645.  Indeed, contrary to Plaintiff's bare assertions, evidence in the record suggests that he frequently displayed normal dexterity, grip strength, gait, and strength, and at least one medical provider suggested that Plaintiff may have exaggerated the severity of his tremors.  (ECF. No. 12, at PageID.362, 365, 595, 599, 649, 663, 744, 753, 764, 872, 894–95, 903, 911.)  Thus, I suggest that because substantial evidence supports the conclusion that Plaintiff would not frequently miss work, the ALJ had no reason to discuss potential absenteeism in her decision.  *Cf. Hartman*, 954 F. Supp. 2d at 645.  For these reasons, I suggest that the ALJ's RFC finding was supported by substantial evidence.

### iv.  Obesity

Next, Plaintiff argues that the ALJ erred at steps two through five because she failed to sufficiently articulate the extent to which he considered the Plaintiff's obesity. According to Plaintiff, the ALJ's "limited discussion" prevents this Court from determining to what extent the ALJ considered Plaintiff's obesity, both on its own and "in combination with other impairments."  (ECF No. 18, at PageID.1009.)

Social Security Ruling 19-2p, 2019 WL 2374244, (May 20, 2019) recognizes that a claimant's obesity, when considered in combination with a claimant's other impairments, may increase "the severity or functional limitations of the other impairments"; however, SSR 19-2p "does not mandate a particular mode of analysis."  *Bledsoe*, 165 F. App'x at 411–12.  Thus, to adequately consider a claimant's obesity, an ALJ need only "[credit]

'RFCs from physicians who explicitly accounted for [the claimant's] obesity.'"   *Miller*, 811 F.3d at 835 (quoting *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 443 (6th Cir. 2010)). [5]

Here, the ALJ considered Plaintiff's obesity, both on its own and in conjunction with other impairments.   However, the ALJ determined that Plaintiff's obesity was non-severe because she found no evidence in the record of "additional limitations or symptoms of [Plaintiff's] obesity."   (ECF No. 12, at PageID.59.)   Indeed, the state examining consultant, Dr. Lazzara, observed that Plaintiff's blood pressure was stable, that he had a marginally limited range of motion, that he displayed a relatively normal pulse and blood pressure, and that he did not display signs of heart failure.   (*Id.* at PageID.663–66.)   The only abnormal finding related to his obesity was a "mitral regurgitant murmur"; however, the murmur "appear[ed] to be medically controlled."   (*Id.* at PageID.666.)   The ALJ also relied on recommended RFC findings from physicians who accounted for Plaintiff's obesity.   (*Id.* at PageID.66–67, 106, 121.)   The ALJ gave partial weight to the examining physician who acknowledged Plaintiff's height and weight, and the ALJ also gave partial weight to the non-examining medical consultant, who recognized that Plaintiff has a BMI of 34.8.   (*Id.*); *cf. Arroyo v. Comm'r of Soc. Sec.*, No. 14-14358, 2016 WL 424939, at *2

---

[5] Although *Bledsoe*, *Miller*, and *Coldiron* apply Social Security Ruling 02-1p, 2002 WL 34686281 (Sept. 12, 2002), which was rescinded and replaced by SSR 19-2p, this Court has recognized that both "rulings are fundamentally identical when it comes to considering obesity as a factor."   *Dilworth v. Saul*, Case No. 19-cv-12134, 2021 WL 869654, at *3 n.2 (E.D. Mich. Mar. 9, 2021); *see also Chris Smith v. Comm'r of Soc. Sec.*, Case No. 1:20-cv-1366, 2021 WL 3566695, at *11 n.7 (N.D. Ohio May 28, 2021).

(E.D. Mich. Feb. 4, 2016).  Thus, I suggest that the ALJ adequately considered Plaintiff's

obesity under SSR 19-2p.

### v.  Whether the ALJ's Hypothetical Presented to the Vocational Expert Adequately Described Plaintiff's Limitations.

Last, Plaintiff argues that the ALJ's step five finding was not supported by

substantial evidence because the ALJ relied on vocational expert ("VE") testimony that

was prompted by a flawed hypothetical.  *See Edwards v. Barnhart*, 383 F. Supp. 2d 920,

931 (E.D. Mich. 2005).  A VE's "testimony given in response to a hypothetical question"

generally "constitutes substantial evidence," but "only if [the hypothetical] accurately

reflects the claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594

F.3d 504, 516 (6th Cir. 2010).  While the hypothetical need not list all of a claimant's

impairments verbatim, it must "include an accurate portrayal of [a claimant's]"

impairments. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 632 (6th Cir. 2004).

First, Plaintiff relies on *Eisler v. Barnhart*, 344 F. Supp. 2d 1019, 1028 (E.D. Mich.

2004) to argue that the ALJ's hypotheticals to the VE were flawed because they failed to

include limitations that accounted for Plaintiff's depression.  In *Eisler*, the ALJ found that

the claimant's depression was a severe impairment; however, the ALJ's hypothetical to the

VE did not include any limitations related to the claimant's depression.  *Id.*  While the

ALJ's hypothetical did limit the claimant to unskilled work, this Court reasoned that this

limitation did not adequately account for the claimant's depression.  *Id.* at 1029.  This Court

explained that this restriction accounted for the claimant's "work skills" (his ability to do

a specific job), but not his mental abilities (his ability to understand, remember, and carry

out skills), which would be affected by his depression. *Id.* Thus, the VE's testimony did not constitute substantial evidence from which the ALJ could properly rely. *Id.*

Here, unlike *Eisler*, the ALJ included several limitations that accounted for Plaintiff's severe depression besides his restriction to unskilled work. Specifically, the ALJ's hypothetical presented an individual who was limited to "simple, routine, and repetitive tasks" in a "predictable" work setting with infrequent changes that could be "easily explained." (ECF No. 12, at PageID.101–02.) The hypothetical person was further limited to making "simple, work-related decisions," and could not work "at production rate pace." (*Id.*) The hypothetical also provided that the person could only "respond appropriately to occasional interaction with supervisors, coworkers[,] and the general public." (*Id.*); *see Eisler*, 344 F. Supp. 2d at 1028 (reasoning that the ALJ's initial hypothetical seemed to have adequately "accommodated Plaintiff's depression, as least in part, by including a restriction of "[n]o work involving dealing with the public"). Thus, unlike in *Eisler*, the ALJ here adequately accounted for Plaintiff's severe depression in his hypothetical to the VE.

Plaintiff also relies on *Benton v. Comm'r of Soc. Sec.*, 511 F. Supp. 2d 842 (E.D. Mich. 2007) to argue that the ALJ's hypothetical was flawed because it failed to account for Plaintiff's moderate limitations in "concentration, persistence, and pace . . . ." In *Benton*, the ALJ found that the claimant had a "moderate deficiency in her ability to maintain concentration, persistence, and pace," and found that the claimant was limited to "simple, routine, [and] repetitive" work. *Id.* at 849. However, this Court reasoned that the limitation did not adequately account for the claimant's impaired concentration because an

individual with a moderate limitation in concentration might still "be unable to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job." *Id.* (citing *Edwards*, 383 F. Supp. 2d at 930 ("When the ALJ makes a ... finding that the claimant 'often' has problems with concentration, but does not specifically include that limitation in the hypothetical question, the question is whether the ALJ used adequate alternate concrete job restrictions in the hypothetical question that suitably accommodated the worker's concentration limitations.")).

Here, while the ALJ found that Plaintiff had moderate limitations in his ability to maintain concentration, persistence, and pace, her hypothetical adequately described Plaintiff's limitations.  (ECF No. 12, at PageID.61, 101–02.)  Unlike the hypothetical in *Benton*, the ALJ's hypothetical here did not simply limit Plaintiff to "simple" and "routine" work, but it also assumed that the hypothetical person could not work at a "production rate pace," which meant "[f]or example," that the hypothetical person could not perform "assembly line work."  (*Id.* at PageID.101–02.)  Further, the ALJ addressed Plaintiff's impaired concentration by noting that the hypothetical person was "limited to simple, work-related decisions . . . in a predictable work setting."  (*Id.*)  Thus, the ALJ's hypothetical to the VE addressed Plaintiff's potentially limited ability to "meet quotas, stay alert, or work at a consistent pace."  *Benton*, 511 F. Supp. 2d at 849; *cf. Dunn v. Saul*, No. 19-13133, 2020 WL 7700614, at *9 (E.D. Mich. Nov. 30, 2020) (holding that the ALJ's hypothetical addressed the claimant's ability to "meet quotas, stay alert, or work at a consistent pace by precluding jobs with "production-rate pace such as on an assembly line" and limiting the claimant to "simple instructions").  Because the ALJ's hypothetical

accurately reflected Plaintiff's impairments, the VE's testimony constituted substantial evidence from which the ALJ properly made her step five finding.

### H. Conclusion

For the previously discussed reasons, I suggest that substantial evidence supports the Commissioner's denial of benefits, and I recommend **DENYING** Plaintiff's motion, (ECF No. 14), **GRANTING** Defendant's motion, (ECF No. 17), and affirming the decision.

### III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: September 24, 2021

S/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge